IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| REPUBLIC INSURANCE COMPANY, | ) | |
| now known as Starr Indemnity Liability | ) | |
| Company, | ) | |
| Plaintiff, | ) | |
| Counter Defendant, | ) | |
| | ) | |
| v. | ) | No. 10 C 5039 |
| | ) | |
| BANCO DE SEGUROS DEL ESTADO | ) | |
| and GROUP DES ASSURANCES | ) | |
| NATIONALES, | ) | |
| | ) | |
| Defendants, | ) | |
| Counter Plaintiffs. | ) | |

# <u>OPINION AND ORDER</u>

Plaintiff Republic Insurance Company ("Republic"), n/k/a Starr

Indemnity Liability Company, seeks a judgment for amounts allegedly due from

defendants Banco De Seguros Del Estado ("Banco") and Group Des Assurances

Nationales ("GAN") under a retrocession (reinsurance of reinsurance) known as

the LMX Contract for account-year 1980. Defendants counterclaim for rescission.

Republic is a Texas corporation with its principal place of business in New York

City since 2007, but in Dallas, Texas prior to that. Banco is incorporated in

Uruguay and GAN in France, with each having its principal place of business in the country in which it is incorporated. The amount in controversy is in excess of $75,000. The court has jurisdiction of the parties and the subject matter. 28 U.S.C. § 1332(a)(2).

Presently pending are the parties' cross motions for summary judgment. Plaintiff contends defendants are liable based on an open account theory and also liable for prejudgment interest. Defendants contend there is no liability based on an open account; the retrocession is subject to rescission for plaintiff's failure to comply with a warranty or condition precedent; and plaintiff's claims are untimely. Alternatively, defendants contend the amount due should not include certain amounts and is not sufficiently established for purposes of summary judgment.

On a motion for summary judgment, the entire record is considered with all reasonable inferences drawn in favor of the nonmovant and all factual disputes resolved in favor of the nonmovant. *Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 n.1 (2009); *Malen v. MTD Prods., Inc.*, 628 F.3d 296, 303 (7th Cir. 2010); *Stokes v. Bd. of Educ. of City of Chicago*, 599 F.3d 617, 619 (7th Cir. 2010). The burden of establishing a lack of any genuine issue of material fact rests on the movant. *Ponsetti v. GE Pension Plan*,

614 F.3d 684, 691 (7th Cir. 2010); *Outlaw v. Newkirk*, 259 F.3d 833, 837 (7th Cir.

2001). The nonmovant, however, must make a showing sufficient to establish any

essential element for which it will bear the burden of proof at trial. *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Montgomery v. Am. Airlines, Inc.*,

626 F.3d 382, 389 (7th Cir. 2010). The movant need not provide affidavits or

deposition testimony showing the nonexistence of such essential elements.

*Celotex*, 477 U.S. at 324; *Freundt v. Allied Tube & Conduit Corp.*, 2007 WL

4219417 *2 (N.D. Ill. Nov. 29, 2007); *O'Brien v. Encotech Constr.*, 2004 WL

609798 *1 (N.D. Ill. March 23, 2004). Also, it is not sufficient to show evidence

of purportedly disputed facts if those facts are not plausible in light of the entire

record. *See Lorillard Tobacco Co. v. A & E Oil, Inc.*, 503 F.3d 588, 594-95

(7th Cir. 2007); *Yasak v. Ret. Bd. of Policemen's Annuity & Benefit Fund of*

*Chicago*, 357 F.3d 677, 679 (7th Cir. 2004); *Lampley v. Mitcheff*, 2010 WL

4362826 *6 (N.D. Ind. Oct. 27, 2010). As the Seventh Circuit has summarized:

> The party moving for summary judgment carries the
> initial burden of production to identify "those portions of the
> pleadings, depositions, answers to interrogatories, and
> admissions on file, together with the affidavits, if any, which it
> believes demonstrate the absence of a genuine issue of
> material fact." *Logan v. Commercial Union Ins. Co.*, 96 F.3d
> 971, 978 (7th Cir. 1996) (citing *Celotex Corp. v. Catrett*,
> 477 U.S. 317, 323, 106 S. Ct. 2548 (1986) (citation and

- 3 -

internal quotation omitted)).  The moving party may discharge this burden by "'showing'--that is, pointing out to the district court--that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S. Ct. 2548.  Once the moving party satisfies this burden, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e).  "The nonmovant must do more, however, than demonstrate some factual disagreement between the parties; the issue must be 'material.'" *Logan*, 96 F.3d at 978.  "Irrelevant or unnecessary facts do not preclude summary judgment even when they are in dispute." *Id.* (citation omitted).  In determining whether the nonmovant has identified a "material" issue of fact for trial, we are guided by the applicable substantive law; "[o]nly disputes that could affect the outcome of the suit under governing law will properly preclude the entry of summary judgment." *McGinn v. Burlington Northern R.R. Co.*, 102 F.3d 295, 298 (7th Cir. 1996) (citation omitted).  Furthermore, a factual dispute is "genuine" for summary judgment purposes only when there is "sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S. Ct. 2505 (1986).  Hence, a "metaphysical doubt" regarding the existence of a genuine fact issue is not enough to stave off summary judgment, and "the nonmovant fails to demonstrate a genuine issue for trial 'where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party . . . .'" *Logan*, 96 F.3d at 978 (quoting *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348 (1986)).

*Outlaw*, 259 F.3d at 837.

Each side requests to strike certain aspects of the other side's factual presentation. Defendants complain certain paragraphs of plaintiff's Local Rule 56.1 factual statement are not short and concise and cover multiple topics. It is within the court's discretion as to how strictly to enforce the Local Rules. *See Trade Fin. Partners, LLC v. AAR Corp.*, 573 F.3d 401, 409 (7th Cir. 2009); *Bordelon v. Chicago Sch. Reform Bd. of Tr.,* 233 F.3d 524, 527 (7th Cir. 2000); *Zitzka v. Vill. of Westmont*, 743 F. Supp. 2d 887, 897 (N.D. Ill. 2010). Regardless of whether any of the paragraphs actually violate Rule 56.1, each paragraph is understandable and defendants have not had a problem responding to them. No paragraph of plaintiff's statement will be stricken. *Cf. Sklyarsky v. ABM Janitorial Servs., Midwest*, 2012 WL 174647 *3 (N.D. Ill. Jan. 18, 2012), *aff'd by unpublished order*, 494 F. App'x 619 (7th Cir. 2012), *cert. denied*, 133 S. Ct. 1247 (2013); *Morrow v. Potter*, 2011 WL 663029 *2 (N.D. Ill. Feb.10, 2011).

Plaintiff objects that the declaration of Silvia Rocha (Def. Exh. 2) is not based on personal knowledge. Rocha is the Division Manager of Banco's Department of Reinsurance. She testifies as to Banco's record-keeping practices and also provides testimony as to what is in the records, including for example, the last date certain notices were sent or received; with whom correspondence existed,

and that there is no record of a communication regarding certain specific subjects. Plaintiff contends Rocha cannot have personal knowledge because she only began working in the Reinsurance Department at the beginning of 2012. A custodian of records or other qualified witness, though, need not have personal knowledge of the entries in business records nor be the person who prepared the records. *See United States v. LeShore*, 543 F.3d 935, 941-42 (7th Cir. 2008); *King v. Schieferdecker*, 2011 WL 3273167 *3 (C.D. Ill. Aug. 1, 2011). Rocha may properly provide testimony as to what documents are in Banco's files. Her declaration will not be stricken.

Plaintiff also objects to the declaration of Ernesto Palomo (Def. Exh. 15), one of the attorneys representing defendant Banco in this case. Plaintiff again raises personal knowledge issues. Palomo testifies as to the contents of certain documents that were received from plaintiff in discovery. All the cited documents are also provided as exhibits. The documents speak for themselves regardless of what Palomo states in his declaration. Also, when presented by defendant, documents provided by plaintiff in discovery are deemed authentic. *Marinov v. Trs. of Purdue Univ.*, 804 F. Supp. 2d 849, 862 (N.D. Ind. 2011); *Rodriguez ex rel. Fogel v. City of Chicago*, 2011 WL 1103864 *1 n.3 (N.D. Ill.

March 25, 2011).  Palomo's declaration establishes that the cited exhibits are documents provided in discovery and thus serves as a means of authenticating the documents.  His declaration will not be stricken.

_____

The following facts are taken as true for purposes of each side's motion for summary judgment.  In 1972, Republic entered into a written "Syndication Agreement" with Pan Atlantic Group, Inc., Pan Atlantic Reinsurance Company Limited, its subsidiaries, and affiliates ("PAG"), an underwriting agent based in New York City.  Under the Syndication Agreement and a later addendum, PAG was appointed as Republic's agent and authorized to issue reinsurance policies in Republic's name (as a so-called front company) and to procure retrocessional coverage for the reinsurance.  The Syndication Agreement provides that PAG "may enter into similar or substantially similar agreements with any other insurance company or companies or other insurers; to that end exposures may be divided proportionally among various companies."  It further provides that each contract "shall be on an account-year basis."  Defendants are not parties to the Syndicate Agreement itself.

PAG obtained retrocessional coverage for 1977-80 insurance years for and on behalf of the Members of the Pan Atlantic Reinsurance Syndicate ("the Reinsured"). Among the retrocessional contracts entered into by PAG for the Reinsured were quota share contracts known as the "LMX Quota Share Treaty or the LMX Contract." LMX stands for London Market Excess. The LMX Contract states that the Reinsured accepts reinsurance policies and or contracts issued to Lloyd's Underwriters and the so-called London Market Fringe Companies and are desirous of reinsuring or ceding a portion of their liability under such business by quota shares to participating retrocessional insurance companies. The 1979 and 1980 contracts are at issue in this case.

The business covered was business to be written entirely in London and its vicinity. Although written in London, the business insured entities and risks in many different countries including the United States.[1] The LMX Contract was

_____

[1] In its Reply at 5, Republic asserts that "[t]he vast majority of underlying insured risks are large U.S. companies," citing its Fact Statement ¶ 6, Ellis Dep. [Docket 79-18] at 73-74, and Def. Exh. 53 at 7 [Docket 89-20 at 23]. Neither Fact Statement ¶ 6 nor any other paragraph of the Factual Statement contains such an assertion so defendants did not admit or deny this assertion. Ellis's deposition testimony does not support this assertion. The document cited is a list of losses claimed on the 1980 LMX Contract, not necessarily a list of all underlying insurance policies. While many of the loss descriptions reference apparently American companies, there is no indication whether the activities insured occurred in the United States or were part of international activities of the "large U.S.

initially drafted by Alexander Howden Insurance Brokers Ltd. ("Howden") of London. PAG's John O'Hare provided a final version that was sent back to Howden to obtain signatures. Howden is also named in the contracts as the intermediary through whom all transactions and communications shall be transmitted. Banco executed its copy of the LMX Contracts in Uruguay and sent it to Howden in London. Banco participated in the LMX Contract for account-years 1977 through 1980. GAN's participation was obtained through London entity Benfield Lovik & Rees & Co. Ltd. ("Benfield") and a broker in France. GAN participated in account-years 1979 and 1980. The present dispute is based on the 1980 LMX Contract, but includes claims for carryovers from prior years.[2]

The reinsured Syndicate members, retained 55% of the reinsurance business for the 1980 LMX Contract and 50% of the reinsurance business for the 1977 to 1979 LMX Contracts. Republic, the front company, as a member had a share of approximately 5%. The balance of the reinsurance coverage, including premiums and risks, was ceded to the treaty quota participants. Defendant Banco

companies" that are mentioned.

[2]Article 7 of the 1980 LMX Contract provides for the transfer of unearned premium reserves, loss, and loss expense from one Quota Share year to the subsequent Quota Share year thereby allowing a reinsurance year to close. *See* Barlow Lyde & Gilbert, LLP, *Reinsurance Prac. & the Law*, §§ 4.64-.67 (2009).

accepted proportions of the remaining 45% or 50%, respectively, that was ceded to retrocessional entities by the reinsured, the members of the Syndicate.  Banco had approximately 3.7% and GAN approximately 2.22%.  In this action, Republic is only suing for sums due it from the defendants for its own losses.

The LMX Contract shall be deemed to continue in full force for an "unlimited period"  Art. 4.[3]  The Reinsured shall not be prejudiced by any omission to report any loss.  Art. 3(b).  The Reinsured under the LMX Contract has control of the settlement of all claims.  Art. 6(a).  Defendants "shall in all respects follow the fortunes of the Reinsured."  Art. 6(c).  All loss settlements are "unconditionally binding" upon defendants, *id.*, and the Reinsured may offset losses against any balance that may be due, Art. 6(d).  In the event of default by defendants, "the Reinsured shall be entitled to retain the balance due . . . until full payment has been made or alternatively set-off."  Art. 10.  Upon termination all rights are to continue until the expiration of liability for reinsurance.  Art. 11(c).  The Reinsured is obligated to provide semi-annual reports of reserves and losses, Art. 5, and an annual report of profits, Art. 8(d).  These contract provisions and the reports issued

---

[3]Unless otherwise indicated, citations to contract provisions are to the 1980 LMX Contract.

established a mutual open account between the Reinsured and each of the quota share reinsurers.

The 1980 LMX Contract provides:  "It is warranted that the Reinsured shall retain (subject to Excess of Loss Reinsurance) 55% of all Policies and/or Contracts Ceded hereunder."  The 1977 through 1979 LMX Contracts provide:  "It is a condition of this Reinsurance that the [Reassured/Reinsured] shall retain (subject to Excess of Loss Reinsurance) 50% of all Policies and/or Contracts ceded hereunder."  In the LMX Contract, the Reinsured is identified as:  "Pan Atlantic Group, Inc., Pan Atlantic Reinsurance Company Ltd., their subsidiaries and affiliates on behalf of members of the Pan Atlantic Reinsurance Syndicate."  Defendants contend that Republic itself, the front company, is the Reinsured to whom the retention requirement applies and that its ceding to the Syndicate or failing to retain the warranted retentions violated the requirement.  Defendants rely on the following stipulated facts provided during discovery in this case.

> (c)  During the period January 1, 1977 to December 31, 1979 50% of the LMX Business was ceded by Republic to the Pan Atlantic Reinsurance Syndicate and 50% was ceded by Republic to the LMX Quota Share Treaty.

> (d)  During the period January 1, 1980 to December 31, 1980 55% of the LMX Business was ceded by Republic to the Pan

Atlantic Reinsurance Syndicate and 45% was ceded by Republic to the LMX Quota Share Treaty.

(e)  Republic was the only party to have ceded the Republic Fronted Business to the LMX Quota Share Treaty for the 1977-1980 Treaty years.

(f)  As it relates to the Republic Fronted Business, Republic is the only reinsured that is entitled to recovery under the LMX Quota Share Treaty for the years 1977-1980.

(g)  Republic's claims against GAN are based solely upon the Republic Fronted Business which Republic ceded to the LMX Quota Share Treaty for the years 1977-1980, and Republic asserts no other claims against GAN.  The amounts ceded to the Pan Atlantic Syndicate are not included within the claims made in the above-captioned lawsuit.

Def. Exh. 33 ¶¶ 1(c)-(g).

Defendants' first contention is that the LMX Contract should be rescinded because Republic breached the retention provision.  This contention is without merit because inconsistent with the language of the LMX Contract.  The LMX Contract is clear that the retention provision applies to the Reinsured and that the Reinsured under the LMX Contract is PAG on behalf of the members of the Pan Atlantic Reinsurance Syndicate.  The LMX Contract is clear that "Reinsured," as used in the LMX Contract, means the Syndicate.  The retention provision refers to "retain[ing]" "Policies and/or Contracts" that have been "Ceded."  It does not

state that the Syndicate members must have been reinsureds or that the Syndicate itself ceded the insurance.  Although Republic was the front company, the retention provision is not binding on it individually.

It is undisputed that the Syndicate retained 55/50% of the policies and contracts while 45/50% was ceded to others, which is all that was promised.  For every $100 in losses, the syndicate members have retained $55 and the remaining $45 was ceded to the LMX contract participants.  It is irrelevant whether the Syndicate had those policies as original reinsurance or as a retrocession; the retention requirement is to "retain . . . 55[50]% of all Policies and/or Contracts Ceded."  Defendants' defense based on the retention provision fails and their counterclaims based on this provision will be dismissed.

Article 5 of the LMX Contract provides:

> In each year during the continuance of this Agreement the Reinsured shall prepare or cause to be prepared semi-annual accounts for each Account-Year (as hereinafter defined) within 90 (ninety) days of the close of each half year which shall be deemed to close on June 30th and December 31st respectively.  The Accounts shall be confirmed by the Reinsurers within 30 (thirty) days and the balance shall be paid by the debtor within a further period of 60 (sixty) days after confirmation.

Until 1993, transactions between PAG on behalf of the members of the Syndicate and defendants flowed through Howden. From 1993 until October 2003, no semi-annual account statements were sent to defendants. Beginning in 1993, there was litigation between Republic and PAG. That litigation was settled in 1995, with Republic taking over PAG's prior duties to manage the accounts. Republic, by its agent, settled with all of the Quota share participants other than the present defendants.[4] Other than asserting that a transition and settlements were occurring, Republic provides no evidence to explain why no account statements were issued until 2003, eight years after settling. Starting in 2003, the accounts

---

[4]Consistent with the practice of some underwriters in London, claims against the other quota share treaty participants were settled without the invocation of the statute of limitations. *See Cont'l Cas. Co. v. Stronghold Ins. Co., Ltd.*, 77 F.3d 16, 21 (2d Cir. 1996): "Because custom and usage have established a gentility and unity of interest between the reinsured and its reinsurer, *cf. Sumitomo Marine & Fire Ins. Co. v. Cologne Reins. Co.*, 75 N.Y.2d 295, 298, 552 N.Y.S.2d 891, 892, 552 N.E.2d 139, 140 (1990) (reinsurance is 'a field in which differences have often been settled by handshakes and umpires'), a generation ago, we doubt that the defendants would even have considered asserting a statute of limitations defense. *See* Ronald C. King, *Limitation of Action Considerations in Respect of U.K. Insurers*, 61 Def. Couns. J. 226, 226 (1994) ('Defences based on available periods of limitation usually have not been taken by insurers in the London market, and some participants in the market feel that it is a custom not to assert them.'). With the collapse of prominent British reinsurers, and the financial distress of Lloyd's of London, times may have changed. *Id.* at 226, 231; *see also Unigard Sec. Ins. Co. v. North River Ins. Co.*, 4 F.3d 1049, 1054 (2d Cir. 1993). As François Villon sighed: *Où sont les neiges d'antan?* ('Where are the snows of yesteryear?')."

were managed by Republic's designated agent, Resolute Management, Inc., which is located in Dallas. Thereafter, semi-annual account statements showing credits and debits have been issued to the date of the filing of suit and thereafter. The runout of the underlying insurance coverage and claims takes many years.

Republic contends that, as of November 17, 2011, Banco owed $569,708.36 and GAN owed $328,098.76 plus, respectively, $326,276.88 and $186,442.67 in claimed prejudgment interest based on a 9% interest rate under New York law. The present lawsuit was filed on August 11, 2010. Prior to the June 30, 2004 billing, Banco and GAN allegedly owed (without prejudgment interest), respectively, $334,345.64 and $186,919.91, nearly 60% of the amounts allegedly owed as of November 2011. *See* Ellis Dep. Exh. 7 [Docket Entry 79-8].

Defendants rely on either a New York or English six-year limitation period. Since billings were to be paid within 90 days, defendants contend claims based on particular billings accrue 90 days after the bill is issued. Billings were to be issued within 90 days after the end of each six-month period. Therefore, claims based on the unpaid June 30, 2004 billing accrued after August 11, 2004 Defendants do not contend otherwise.

In contending that no claims are barred by a statute of limitations defense, Republic relies on an open account theory. Republic contends that New York law applies in determining any applicable statute of limitations effect while defendants contend English law applies. Both sides contend their theories would succeed even if the alternative law applies. It will first be determined which law should apply to the LMX Contracts.[5]

The parties agree that Illinois choice-of-law principles determine which law to apply. If a cause of action arose outside Illinois and the law of that locale would bar the claim as untimely, the law of that locale will apply. 735 ILCS 5/13-210. The parties also agree that, in determining where the action arose, Illinois applies the "most significant relationship test" that is found in the *Restatement (Second) of Conflict of Laws*, § 188 (1971) ("*Restatement*"). **Hinc v. Lime-O-Sol Co.**, 382 F.3d 716, 719 (7th Cir. 2004); **Telular Corp. v. Mentor Graphics Corp.**, 282 F. Supp. 2d 869, 872-73 (N.D. Ill. 2003) (cited by defendants); **Emp'rs Ins. of Wausau v. Ehlco Liquidating Trust**, 309 Ill. App. 3d 730, 723 N.E.2d 687, 695-96 (1st Dist. 1999) (cited by plaintiff); **Guarantee Trust**

---

[5]As indicated below, the result on the merits would likely be the same under both English and New York law. However, it would still be necessary to determine which law is applicable because of different prejudgment interest rates.

*Life Ins. Co. v. First Student Programs, LLC*, 2009 WL 196311 *2 (N.D. Ill.

Jan. 28, 2009). Factors to consider include (1) the place of the contracting; (2) the

place of negotiating; (3) the place of performance; (4) the location of the contract's

subject matter; and (5) the locations of the parties. *Restatement* § 188(2). The

significance of each factor will depend upon the issue involved. *Ehlco*, 723

N.E.2d at 694. "If the place of negotiating the contract and the place of

performance are in the same state, the local law of this state will usually be

applied." *Restatement* § 188(3); *Gramercy Mills, Inc. v. Wolens*, 63 F.3d 569, 572

(7th Cir. 1995). The parties also agree that their justified expectations can be

considered. *Hussein v. L.A. Fitness Int'l, L.L.C.*, 2013 IL App (1st) 121,426, 987

N.E.2d 460, 464 (2013); *Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 319 Ill.

App. 3d 218, 743 N.E.2d 629, 640 (1st Dist. 2001).

The drafting of the LMX Contracts occurred in London with some

modifications made by a person who primarily worked in Ireland. London brokers

or intermediaries, with some help from a French broker, solicited defendants'

participation in the contract. Banco and GAN signed the contracts in their

respective countries, but, under English law, the contract became binding when

acceptance was received in London. P.T. O'Neill & J.W. Woloniecki, *Law of*

*Reinsurance in England & Bermuda*, §12-033, at 735 (3d ed. 1998) ("*O'Neill*") ("[U]nder English law the reinsurer is bound at the time at which he signifies his acceptance to the terms proposed by the reinsured. . . . The contract is made at the place where the acceptance is communicated to the reinsured/his agent.").[6] As to place of contracting, PAG's base in New York is of little importance since brokers in London were drafting the contract, soliciting reinsurers, and accepting the signed contract. *Houston Cas. Co. v. Certain Underwriters at Lloyd's London*, 51 F. Supp. 2d 789, 797 (S.D. Tex. 1999). The place of negotiations and contracting favor applying English law.

Republic's obligation to defendants under the LMX Contract is to pay premiums and remit semi-annual account statements. Defendants' obligation is to indemnify losses. Under the contract, the account statements were to be issued from London and payments or credits were issued from and to a London-based

---

[6]Under Illinois law, the general rule is that the place of contracting is the location where the contract offer is signed and placed in the mail or otherwise sent. *Lewitton v. ITA Software, Inc.*, 2008 WL 4427512 *4 (N.D. Ill. Sept. 29, 2008), *aff'd*, 585 F.3d 377 (7th Cir. 2009). New York apparently would follow the same rule. *Restatement (Second) of Contracts* § 64 cmt. c (1981); *Kay v. Kay*, 28 Misc. 3d 1206(A), 957 N.Y.S.2d 636, 2010 WL 2679897 *3 (N.Y. Sup. June 17, 2010) (unpublished). But even applying that rule, the places of contracting were Uruguay and France, and no party contends the laws of either of those countries should apply. To the extent place of contracting is a factor to consider, it supports the application of English law more than New York law.

entity. The focus of the LMX Contract, a retrocession, is not the underlying insurance coverage, but the obligations between the insured (which is already a reinsurer) and defendant reinsurers, who are providing a retrocession. The parties' obligations under the LMX Contract--paying premiums, issuing statements, and providing indemnity payments--are acts primarily conducted in London. The performance of the LMX Contract should be considered to occur in London. *See Emerson Elec. Co. v. Aetna Cas. & Sur. Co.*, 319 Ill. App. 3d 218, 743 N.E.2d 629, 641 (1st Dist. 2001) ("Regarding the place of performance, a major factor which courts look to in determining the place of performance of an insurance policy is the place where the claim is to be paid. *See* 4 *Appleman on Insurance 2d* § 21.7, at 309 (1998)."); *Liberty Mut. Fire Ins. Co. v. Woodfield Mall, L.L.C.*, 407 Ill. App. 3d 372, 941 N.E.2d 209, 219 (1st Dist. 2010) (citing *Emerson*); John S. Butler & Robert M. Merkin, *Reinsurance Law* D-0828 & n.5 (Oct. 2011) (English law: under reinsurance agreement, "if payment is to be made via a broker, the place of performance of the obligation in question is the broker's location or that of his bank").

Plaintiff notes that much of the underlying insurance purportedly covers risks located in the United States. But the location of the risks being insured is not

a factor particularly relevant to the choice-of-law determination regarding a reinsurance contract, and even less so for a retrocession that is one step further removed. *Int'l Ins. Co. v. Certain Underwriters at Lloyd's London*, 1991 WL 349907 *10 (N.D. Ill. Sept. 16, 1991). And even if the location of the underlying risk was relevant, the risk being insured is located all over the world. When the insured risk is located in multiple jurisdictions, it is a fact that carries no weight. *Ehlco*, 723 N.E.2d at 695; *Houston Cas.*, 51 F. Supp. 2d at 797. To the extent any of the underlying insurance should be considered, it is more pertinent that the underwriters are located in the London area. The subject matter of the contract is primarily focused on London.

The parties also make contentions regarding their expectations. Permitting defendants to be served in New York City (but sued in any court of competent jurisdiction in the United States) it is argued shows that it was intended that New York law apply. Article 16 provides that "[a]ll disputes or differences arising out of interpretation of this Agreement shall be submitted" to arbitrators selected by the Chairman of the Reinsurance Offices Association of London. The choice of a London situs of arbitration, it is argued, provides some evidence of the parties' intent to apply the local law of that jurisdiction. *Restatement* § 218, cmt. b.

On balance it is concluded that English law applies.

The parties do not dispute that the applicable English limitation period is six years for a claim on a written contract. They also agree that the six-year period may be varied by contract. The parties do dispute when the claims are considered to accrue, in part based on the related question of whether the parties' arrangement constitutes an "open account."

Republic contends that, under New York, Illinois, and Texas law, its claims did not accrue until defendants denied coverage, that is, until defendants denied they owed the amounts billed. No such contention is made based on English law. In any event, defendants point out that, under English law, accrual based on denial of a claim is limited to denials based on a declaration of coverage or invalidity of a policy. *See O'Neill*, § 13-107 at 822-23.[7]

Under Article 5 of the LMX Contract, account statements were to be submitted within 90 days after the end of each semi-annual period; defendants had 30 days thereafter to confirm the statement; and the party owing the balance had another 60 days to pay. There is no further provision expressly addressing any

---

[7]Under New York law, claims do not accrue upon denial when, as here, the contract sets a date when payment is due. *See **Hahn Auto. Warehouse, Inc. v. Am. Zurich Ins. Co.***, 18 N.Y.3d 765, 967 N.E.2d 1187, 1191 & n.5 (2012).

applicable statutes of limitations.  Defendants concede that accrual would be no earlier than 180 days after the end of a semi-annual accounting period, that is 90 days for billing, plus 30 and 60 days.

Both sides' rely on *O'Neill* as stating English law.  This treatise states:

*Treaty reinsurance*                                                    **13-108**
Treaty reinsurance generally provides for periodic accounting between the parties.  Limitation issues can therefore arise both for the reinsurer--as to when his right to sue for premium expires, and for the reinsured--as to when his right to sue for claims, or the balance on the account, expires.  The starting point must be that the paying party must pay within the time provided for in the contract following the submission of accounts or within a reasonable time of such submission and thereafter time will begin to run.  Two situations require further consideration:

(1)     What occurs if the party required to submit accounts submits them late, perhaps years late?  Can he take the benefit of his own dilatoriness and say that the six-year limitation period nonetheless only runs from the date of submission--on the assumption the accounts show a balance due him?

(2)     What occurs if later accounts are submitted and accepted, and they incorporate the earlier accounts, or the balance of earlier accounts?

*Late submission of accounts*                                          **13-109**
On each date provided for in the treaty, the reinsured has the right and duty to submit accounts and the reinsurer the right to receive them, and a concomitant cause of action to compel.  It follows, we suggest, that six years after the date such account

should have been submitted, the cause of action, to require the reinsured to account or to require the reinsurer to accept and respond to an account, would be time-barred and the right to any monies which would have been shown to be due, either way, on that account would be lost.  If the account is submitted before the end of that six-year period, then it appears that a separate cause of action arises for the balance due on that account and a further six-year period of limitation begins.  Nonetheless, there has been a breach of contract on the late submission of the account, and assuming (as is generally the case) the balance is in favour of the reinsured, the reinsurer will be able to set off or counterclaim for such damage as he has suffered by the late submission.  He will have difficulty, we suggest, in showing damage.  If the account had been submitted exactly on time, the reinsured could still have sued for the balance at the date when he does submit the account (within the six years from the contracted for date).  If the reinsurer delays payment and is sued almost six years later, some 11years after the account should have been submitted, he has little cause of complaint:  the last five to six years of the period arise from his failure to pay on the submission of the account.

*Later accounts taking up earlier accounts*          **13-110**
Chitty cites *Laycock v Pickles* to provide a definition of an "account stated":

> "[T]he accounts includes items on both sides and the parties have agreed that there shall be a set off and only the balance payable."

The agreed balance on such an account forms the basis of a new cause of action and the six-year limitation period runs from the date it is struck.  However, the balance must be agreed and there must be items on both sides.  In *Re Horne and Colonial Insurance Co Ltd*, the reinsured had forwarded to the reinsurer quarterly accounts pursuant to a quota share

treaty, and requested the reinsurer confirm the accounts and remit a cheque for the amount due.  The reinsurer acknowledged the statements, but did not expressly confirm the accounts.  However the reinsurer did enter the amount shown in the reinsured's accounts as due into its books. Maugham J. held that this did not amount to an account stated because the acknowledgment was not communicated to the reinsured.  The reinsurer was wound up.  There followed correspondence between the liquidators and the reinsured's solicitors which it was held did amount to an account stated. Thus, if a reinsured submits an account to a reinsurer containing credits for premium and debits for claims and if the reinsurer accepts the balance as correct, there will be a cause of action for that balance even if in arriving at it "time-barred" claims have been included.  Now, if the treaty provides that accounts shall be deemed accepted if no queries are raised on them within a specified period after submission to the reinsurer, a reinsurer who does not remain alert may find not only that he has lost his right to challenge the account, but also that he is bound to pay "time-barred" claims.  Under UCP 600 (Uniform Customs and Practice for Documentary Credits), art. l6(c), the bank issuing the letter of credit has a reasonable time for examining documents presented pursuant to the letter of credit to see if they conform.  Once that reasonable time has passed, the bank must pay, irrespective of whether the documents conform.  Contracts of sale of goods internationally frequently provide for certificates of quality to be conclusive and binding on both parties and such "certificate final" clauses are upheld.  Such clauses are considered as exclusion clauses and are strictly construed--it has to be clear from the contracts that the certificate of quality/quantity is to be final on those subjects, but if clear, it is enforced.  Of course the quality certificate is issued by an independent third party; any provision in a reinsurance contract that the accounts rendered by the reinsured should be final and binding if after, say, 30 days the reinsurer raised no objection would not have

the safeguard of a third party consideration, but as Scrutton
L.J. said in *Gurney v Grimmer*, "it is not so usual that A will
agree to pay B an amount fixed by B, but it is a perfectly
possible business transaction."  However, even the plainest
"accounts final" provision would not relieve the reinsured of
his duty to act in good faith.  Our view is that the courts would
not readily uphold "accounts final" provision and we do not
advocate the use of them.  We consider that circumstances
will be rare or non-existent where a reinsured is able to prove
to a court's satisfaction that a reinsurer has accepted and
agreed an account by failure to respond within a time provided
for in the contract.  We consider that the courts will look for
some positive act of agreement.  If they find it, the reinsurers
will be liable for the balance as from the date of that
agreement and time will run from that date.

*O'Neill*, §§ 13-108-110, at 823-25 (footnote citations omitted).

*O'Neill*, § 13-108, is clear that a party cannot rely on an account stated

unless the party receiving the account confirms or otherwise accepts the statement

as valid.  It is uncontested that defendants never confirmed any of the statements

presently at issue.  Plaintiff's contentions based on an account stated theory fail.[8]

---

[8]Even if New York law were to be applied, the parties' account is not "a
mutual, open and current account" for which the statute of limitations is measured
from the last transaction as provided for in N.Y. C.P.L.R. § 206(d).  That provision
does not apply to accounts for which there is a periodic settlement as provided in
the LMX Contract.  *See* ***Rodgers v. Roulette Records, Inc.***, 677 F. Supp. 731,
735-36 (S.D.N.Y. 1988); ***Simpson v. Mut. of Omaha Ins. Co.***, 2000 WL
322780 *6 (S.D.N.Y. March 28, 2000); ***Ridenhour v. UMG Recordings, Inc.***,
2012 WL 463960 *4 (N.D. Cal. Feb. 13, 2012) (New York law).  Under Article 5,
the amount due by either side is to be paid within 90 days after each semi-annual

It is clear that the LMX Contracts created an open account among the parties during which defendants made no objections until after a demand for payment was made. Nevertheless, consistent with English law, a six-year statue of limitations began by virtue of the contract billing provision. Without that provision it would appear that the application of continuous, though interrupted, debits and credits would preclude the running of any statute of limitations.

As to when the billed amounts accrued, defendants rely on § 13-109 of *O'Neill.* Defendants quote: "[S]ix years after the date such account should have been submitted, the cause of action, to require the reinsured to account or to require the reinsurer to accept and respond to an account, would be time-barred and the right to any monies which would have been shown to be due, either way, on that account would be lost." Defendants ignore the very next sentence, but, as discussed below, it does not change the result. The next sentence is: "If the account is submitted before the end of that six-year period, then it appears that a separate cause of action arises for the balance due on that account and a further six-year period of limitation begins." This statement is further reinforced by the example that follows in the section in which a claim brought 11 years after the

statement.

account should have been submitted may still be timely if the account billing was submitted within six years after it was originally due and a suit is brought within six years after the late submission.

On October 13, 2003 and January 28, 2004, plaintiff first billed defendants for amounts that should have been billed during the 10-year period when no bills were being sent. To the extent those billings included amounts that should have been submitted in the June 30, 1997 semi-annual billing[9] or an earlier semi-annual billing, those amounts would be barred by the English statute of limitations. However, to the extent any amounts should have been included in the December 31, 1997 semi-annual billing or a later semi-annual billing, the six years had not yet run out so plaintiff had six years after October 13, 2003 and January 28, 2004 to bring suit for such amounts. Nevertheless, that does not help plaintiff because it did not bring suit until more than six years thereafter,

_____

[9]Ninety days after June 30, 1997 was September 28, 1997 and 90 days after December 31, 1997 was March 31, 1998. Six years before October 13, 2003 was October 13, 1997 and six years before January 28, 2004 was January 28, 1998. September 28, 1997 falls more than six years prior to both actual billings and March 31, 1998 is less than six years before each actual billing. (Since the pertinent dates are not within a few days, it is unnecessary to consider if any date fell on a weekend or holiday, possibly resulting in a few day adjustment depending on whether and how English law makes adjustments for weekend dates or holidays.)

August 11, 2010.  The December 31, 2003 semi-annual billing was also untimely, but was sent on June 1, 2004.  Since this lawsuit was filed more than six years later, claims based on the amounts in that billing are also barred.  The June 30, 2004 semi-annual billing was sent on September 28, 2004.  The present lawsuit is timely as to that billing and all subsequent billings.  Claims based on amounts included in the December 31, 2003 billing and all earlier billings are barred by the applicable statute of limitations.

Since claims based on these billings are barred by the applicable statute of limitations, it is unnecessary to decide defendants' alternative contention that such claims fail based on late notice.  It is noted, though, that *O'Neill*, § 13-109, supports that a defense based on late notice would require a showing that defendants suffered a loss due to the late notice, which defendants do not attempt to show.

GAN is a party to the 1979 and 1980 LMX Contracts.  Unlike, Banco, it was not a party to the 1977 and 1978 LMX Contracts.  With a slight adjustment, plaintiff has been billing GAN for amounts transferred from the 1977 and 1978 Contracts to the 1980 Contract.  Plaintiff relies on Article XII of the 1979 LMX Contract which provides in pertinent part:

> It is mutually agreed between the Reinsurers and the
> Reinsured that the Reinsured shall transfer by portfolio
> 36 months after the commencement of any underwriting year,
> 100% of the remaining unearned premium reserve, 100% of
> the outstanding loss and loss expense reserve as respects
> Casualty business, and 90% of the outstanding loss and loss
> adjustment expense reserve as respects all other business, to
> the next succeeding underwriting year, and that all further
> transactions shall be dealt with in said succeeding year.

That provision refers to transferring 1979 liabilities to future years, not transferring prior year liabilities into 1979. This is especially apparent when comparing Article 12 of the 1980 LMX Contract which contains essentially the same language as above plus additional language expressly stating: "The Reinsurers hereon agree to accept such portfolio transfer from the preceding account-year." Also, Articles 12 of the 1978 and 1979 LMX Contract expressly state that existing liabilities are being assumed under the Contract for each of those years. Plaintiff fails to submit evidence supporting a genuine factual dispute that GAN is liable for amounts owed based on the pre-1979 contracts. GAN is entitled to summary judgment dismissing claims based on such amounts.[10]

---

[10]Any premiums credited to GAN for those years would have to be returned by GAN or otherwise credited to Republic.

Plaintiff asserts that it is entitled to prejudgment interest under New York law. As discussed above, English Law applies. Neither party addresses whether English law would allow for prejudgment interest in the present situation. At this time, no prejudgment interest will be awarded.[11]

As to the post-2003 billings, Banco raises no specific issue that the amounts billed are incorrect. It does contend that plaintiff's proof is insufficient because the actual checks issued to insureds are not provided. Extensive discovery was permitted in this case. Defendants had sufficient opportunity to verify whether these billings were accurate. The proof submitted by plaintiff is sufficient to establish the amount of liability. Since Banco submits no evidence to the contrary, the amounts shown by plaintiff are established. Banco is liable to Republic in the amount of $235,362.72. The amount of GAN's liability cannot presently be determined in that the court has no easy basis for separating out the amounts based on the 1977 and 1978 Contracts. Presumably, Republic and GAN can agree as to the amounts represented by transfers from those contract-years. Republic and GAN shall promptly meet to discuss this issue and shall have a number to provide

---

[11]Under English law, plaintiff may be entitled to the appropriate market rate at simple interest. *See In re Oil Spill by Amoco Cadiz Off Coast of France on March 16, 1978*, 954 F.2d 1279, 1331-33, 1336-37 (7th Cir. 1992).

to the court at the next status hearing.  The parties shall also attempt to reach agreement as to the appropriate amount of prejudgment interest based on today's ruling.[12]  No judgment will presently be entered as against Banco.  A judgment concerning both defendants, as well as the counterclaims, will be issued after the amount of damages owed by GAN and any amounts due as interest are determined.

IT IS THEREFORE ORDERED that the parties' motions for summary judgment [76, 86] are granted in part and denied in part.  Defendants' counterclaims are dismissed with prejudice.  Plaintiff's claims are dismissed to the extent they are based on billings for December 31, 2003 and earlier.  Plaintiff's claims against defendant Group Des Assurances Nationales Defendant ("GAN") are dismissed to the extend based on transfers from the 1977 and 1978 contract years.  Defendant Banco De Seguros Del Estado is liable to plaintiff in the amount

---

[12]Agreeing as to the amount of damages or interest based on today's ruling would not preclude defendants from appealing today's decision based on substantive issues.  All the parties should also consider whether, in light of today's ruling, they can reach a final settlement of this litigation.

of $235,362.72.  Defendant GAN is liable to plaintiff in an amount to be

determined.  A status hearing is set for August 15, 2013 at 2:00 p.m.


ENTER:


UNITED STATES DISTRICT JUDGE


DATED:  JULY 26, 2013